Filed 9/30/22 P. v. Hernandez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C088237 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF171795 ) |
| v. | |
| RICKY GOMEZ HERNANDEZ et al., | |
| Defendants and Appellants. | |

Defendants Ricky Gomez Hernandez and Joshua Armond Cadenaz (defendants)[1] were convicted of various crimes and numerous enhancements were found true related to a string of armed robberies they committed between the late-evening hours of October 18, 2016, and early-morning hours of the following day.[2] Among defendants' many

---

[1] Joshua Armond Cadenaz-Lopez indicated at the start of trial he goes by the last name Cadenaz. Pursuant to his preference, we will refer to him by that last name.

[2] Subsequent date references are to 2016.

1

convictions and enhancements, the jury found defendants guilty of several participation in a criminal street gang offenses (participation offenses) and found true numerous gang enhancements. Following defendants' sentencing, the laws have changed regarding the evidentiary showing necessary and the procedure required to convict them of the participation offenses and to find the gang-related enhancements true. (Assembly Bill No. 333 (2021-2022 Reg. Sess.; Stats. 2021, ch. 699.) The People and defendants agree the new law applies retroactively to defendants such that their case must be remanded for retrial of the participation offenses and gang-related enhancements. We agree and remand accordingly.

Defendants further contend retrial of the participation offenses and gang enhancements is prohibited because insufficient evidence was presented under the prior gang statute to prove the Broderick Boys was a criminal street gang and they acted with the specific intent to benefit the Broderick Boys. In this vein, Hernandez also contends his conviction for the participation offense predicated on his misdemeanor exhibition of a firearm conviction is not supported by sufficient evidence. We agree with Hernandez that there was insufficient evidence supporting one of his participation offenses but disagree with both defendants that there was insufficient evidence supporting the participation offenses and gang-related enhancements under the former gang statute.

As to defendants' other claims, they contend reversal is required because they were prejudiced by having their substantive charges heard alongside evidence of the gang involvement. Defendants raise various other claims pertaining to the trial court's evidentiary rulings and instructions. We conclude some of defendants' evidentiary contentions are moot considering the case must be remanded for retrial on the participation offenses and gang-related enhancements and the rest of the contentions fail to demonstrate prejudicial error. Finally, we need not address defendants' various sentencing claims of error because those claims can be addressed by the trial court upon remand and potential retrial of the matter.

2

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Crimes And Investigation*

Between the evening hours of October 18 and the early-morning hours of October 19, defendants, along with N. L.,[3] committed a series of robberies that were caught on surveillance cameras. Cadenaz and N. L. are half brothers and step siblings to Hernandez's wife. At the time of the crimes, Hernandez was 19 years old, Cadenaz was 20 years old, and N. L. was a minor.

Defendants' crime spree started after nightfall, at approximately 7:00 p.m., at a convenience store in West Sacramento. Hernandez and N. L. arrived in a white or beige sedan and parked in a vacant parking lot next to the convenience store. An employee of the store thought this behavior was odd and took notice of Hernandez such that the employee was able to identify Hernandez at trial. Hernandez and N. L. got out of the car and walked to the convenience store -- Hernandez wore a black shirt and hooded jacket and N. L. wore a red shirt. Hernandez had a few distinctive features about him caught on surveillance footage: a ponytail, black shoes with white soles, and a white belt.

Hernandez and N. L. spent some time in the store but soon left. The employee followed them out the door and watched them walk to their car. While walking to the car, Hernandez turned toward the employee and lifted his shirt to reveal a silver gun with a wooden handle tucked in his waistband. While revealing the gun, Hernandez said, "want a piece of this[?]" Hernandez and N. L. got in the car and sped away. Multiple witnesses heard gunshots ring out when the car left the parking lot.

---

**3**      N. L. was a minor at the time of the crimes and thus we will refer to him by his initials. (Cal. Rules of Court, rules 8.90 & 8.401.)

At 10:14 p.m., a red-light camera in Citrus Heights took a photo of a gold sedan occupied by Hernandez and Alec J. running a red light. Records showed Hernandez's wife owned the gold sedan.

At approximately 12:30 a.m., a blue sedan parked in a parking lot near a convenience store in Sacramento. Surveillance cameras recorded two men, each dressed in a black hooded jacket with a white and black bandana face covering, approach the convenience store. One of the men wore black shorts and green gloves and possessed a black semiautomatic handgun, while the other wore a single gray glove and possessed a gun. The men kicked down the glass night-security doors to the convenience store and then one of them jumped over the counter and took about $30 worth of Zig-Zag cigar wraps and Swisher Sweets cigars.

A little after 1:00 a.m. on October 19, three men were recorded on surveillance footage entering a Denny's restaurant in West Sacramento; the men were wearing hooded jackets and masks and holding guns. One of the men was dressed in long black shorts, black shoes, and a gray tank top under his jacket. He went to a table of three guests and demanded money from them while pointing a semiautomatic handgun at them. Another man, dressed in blue washed jeans, went to the kitchen and forced the line cook to get on the ground while pointing a revolver at him. And the third man, wearing black shoes with white soles, forced an employee to empty the cash register.

Five to 10 minutes later, the West Sacramento Police officers who were responding to the Denny's robbery were called to a robbery at a convenience store across town. The clerk at that convenience store was working behind the counter when three masked men with guns came into the store. One of the men pointed a gun at the clerk and demanded he open the register. The clerk complied. The men took money and cigarettes from the store. Surveillance footage showed three people walking in front of the store and the same three people running in the opposite direction carrying several items seconds later. One person

4

had a ponytail and another was wearing long black shorts. The men left behind a footprint and a glove.

At approximately 2:00 a.m. on October 19, three men ran into a convenience store in Sacramento. They were dressed in black-hooded jackets, wore masks, and possessed guns. One man wore green gloves and long black shorts. A second man wore black shoes with white soles, a white tank top, a red bandana over his face, and a single gray glove. The first and second man jumped over the counter and took various items. Meanwhile, a third man stood by the front door pointing his revolver at a customer and demanding the customer "empty [his] pockets." The man pointing the revolver wore blue washed jeans and a red shirt poking from the bottom of his black hooded jacket.

Defendants were arrested with J. B. and N. L. on October 20 at 6 p.m. during a felony traffic stop of a gray truck owned by J. B. Minutes before being stopped, defendants were seen with N. L. in a gold sedan driving into an apartment complex. J. B. was close behind them in his gray truck. Once in the parking lot, the two cars parked next to each other. Cadenaz got out of the car holding a red rag wrapped around a handgun and wearing a red hat. Hernandez got out of the car with a silver handgun concealed in the waistband of his pants. N. L. was seen holding a box of Swisher Sweets cigars, and J. B. was seen with a red belt and another box of Swisher Sweets cigars. The group transferred items from the gold sedan to the gray truck and covered the gold sedan with a car cover. Before leaving the parking lot, J. B. checked the taillights of the truck, as if he were making sure they functioned properly. In the surveillance footage from the apartment complex, Hernandez is seen wearing black shoes with white soles, similar to a suspect in the surveillance footage from the robberies, as well as the same ponytail hairstyle worn by that suspect.

Following defendants' arrests, officers searched the gray truck and found two loaded handguns -- a .38-caliber silver revolver with a wooden handle and a nine-millimeter black semiautomatic pistol. They also found a red bag with white polka dots containing Cadenaz's driver's license, multiple jars holding a total of 539 grams of marijuana, and the

5

key to a blue sedan. Also in the cab of the truck was a digital scale. In the bed of the truck was a dark duffle bag full of items, including a black replica gun, similar in appearance to a nine-millimeter handgun. Separate from the duffle back was a large box filled with Swisher Sweets cigars.

During a recorded conversation among defendants, J. B., and N. L. in an interview room at the police station after their arrests, the group sounded resigned to the fact they were going to go to jail or prison. They repeatedly warned each other not to talk to the police and assured each other they would not do so. They also revealed the location of the blue sedan and Hernandez admitted to possessing a bullet to a .38-caliber revolver. Throughout their time together, Hernandez could be heard calling the other men his loved ones. During Cadenaz's isolated interview with an officer, he took responsibility for the marijuana found in the polka dot bag in the gray truck. After being told he was arrested for robbery, and before any other details were revealed, Cadenaz claimed he had not gone into a store that night.

During the search of the blue sedan owned by Cadenaz's girlfriend, officers found two packs of Swisher Sweets cigars sitting outside the passenger side door. In a search of the gold sedan owned by Hernandez's wife, officers found packs of Swisher Sweets cigars, Zig-Zag cigar wraps, and a camouflage backpack containing one gray glove and a pair of black gloves. Behind the passenger seat of the gold sedan, a speaker had been removed and inside the hole was a green glove.

During a search of Cadenaz's phone, officers found photos taken on October 18 of Cadenaz wearing green gloves and holding a black handgun similar to the nine-millimeter handgun recovered from the traffic stop and seen on surveillance footage. In a video taken before the robberies, Cadenaz is depicted holding a black handgun. In a video taken after the robberies, Cadenaz is depicted loading a gun magazine. On N. L.'s phone was a picture of him wearing blue washed jeans similar to the jeans worn by one of the men in surveillance footage of the robberies.

6

During a search of Hernandez's home, where officers believed Cadenaz and N. L. were also staying, officers found two hooded black jackets, black gloves, one black and gray glove, and black shoes. The shoes appeared to be similar to the shoes worn by one of the robbery suspects in the surveillance footage. The single black and gray glove looked similar to the single glove worn by a suspect during the Denny's robbery.

During a search of Hernandez's phone, a text message from October 16, between Hernandez and his wife, referenced her "brother" and a "38." A text message sent by Cadenaz on October 20 at 12:43 p.m. asked Hernandez whether he was going to bring the rest of the money over later. Also found, were multiple text messages sent and received between June and August 2016 related to the selling and buying of marijuana.

Cadenaz's DNA was detected on the green glove found in the gold sedan, and N. L.'s DNA was detected on a black bandana. Defendants' and N. L.'s fingerprints were detected on both the blue and gold sedans. A shoeprint impression taken from one of the convenience store robberies was a possible match to a black shoe with a white sole seized from Hernandez. Both the revolver and nine-millimeter semiautomatic handgun were stolen.

II

*Gang Evidence*

The prosecution called West Sacramento Police Detective Matthew Boudinot as an expert on the Broderick Boys, the most prominent criminal street gang in West Sacramento. The Broderick Boys are a subset of the Norteño criminal street gang. They identify with the color red, the letter N, the number 14, and share with other Norteño subsets a rival with the Sureño criminal street gang. The Broderick Boys also identify with the letter B, the acronym BRK, and depictions of crowns. Further, gang members typically associate gang membership with their neighborhood or physical location, and thus it is common for members to have tattoos of the area codes and regions in which they live. In the case of the

7

Broderick Boys, Detective Boudinot often sees members with the phrase East Yolo or East Yolo Boys tattooed on their bodies.

There are various ways to become a gang member. A person can grow up inside of the gang culture or join from the outside. A common feature of becoming a gang member, however, is for a person to "put in work" with gang members or gang affiliates -- the person commits crimes in the presence of gang members or affiliates. The purpose of this is to prove a potential member's worth and loyalty to the gang. Another way to become part of the gang is to be "jumped in" -- assaulted by other gang members, after which the person is accepted as a gang member. In Detective Boudinot's opinion, a person who is merely affiliated with a gang cannot get a tattoo referencing the gang. Gang tattoos are allowed with permission and must be earned. In gang culture, reputation is everything.

Detective Boudinot testified the Broderick Boys' primary criminal activities are: "assault with a deadly weapon, narcotics sales, vehicle theft, [and] robbery," as well as intimidating witnesses, burglary, and shooting at inhabited dwellings. The Broderick Boys are financially sustained by selling narcotics and committing robberies. Violent crimes help sustain the gang because it shows its members' propensity for violence and instills fear in the community. Typical characteristics of crimes committed by the Broderick Boys are that the crimes are committed with other gang members and while armed with guns. Members of the gang often share ownership of a gun and pass it to other members. If someone were to inform the police of the gang's criminal activity, i.e., snitch, that person would be retaliated against with an assault or murder.

Detective Boudinot pointed to several convictions of known Broderick Boys gang members, starting with J. B.'s no contest plea stemming from the instant events for possession of marijuana for sale, with attached gun and gang enhancements, and a participation offense. In Detective Boudinot's opinion, J. B. was an active Broderick Boys gang member on October 20. He based this opinion on the fact J. B. committed the crimes while assisting three other gang members to conceal evidence related to the robberies.

Further, officers found several items of gang indicia in J. B.'s car and J. B. was wearing a red belt with the letter B on it. Upon booking into the county jail, J. B. admitted to affiliating with the Norteño criminal street gang.

Next, Detective Boudinot pointed to Robert V.'s 2014 no contest plea for carrying a concealed weapon and a participation offense. In Detective Boudinot's opinion, Robert was an active Broderick Boys gang member given his multiple contacts with police officers and gang-related photos on his social media profile. Further, Robert admitted to affiliating with the Norteño criminal street gang during a jail classification interview.

Detective Boudinot also pointed to the no contest plea of Kenneth R. for carrying a concealed weapon and a participation offense. Detective Boudinot based his opinion that Kenneth was an active Broderick Boys gang member at the time of his offenses based on photos of Kenneth with other gang members, his multiple tattoos affiliated with the Norteño criminal street gang and Broderick Boys subset, and his admission during a jail classification interview that he associated with the Norteño gang.

Detective Boudinot then pointed to two cases involving Michael R. -- one where he was convicted of premeditated attempted murder with an attached gang and gun enhancement and another where he was convicted of carrying a concealed firearm, unlawful taking of a vehicle, and possession of marijuana for sale. In Detective Boudinot's opinion, Michael was an active Broderick Boys gang member on the date of his crimes because Michael had been classified as a validated gang member by police officers and he had multiple tattoos associated with the Norteño criminal street gang and the Broderick Boys subset.

Finally, Detective Boudinot cited to the no contest plea of Joel M., in which he pled to dissuading a witness, assault with an attached gang enhancement, and a participation offense. Detective Boudinot believed Joel was an active Broderick Boys gang member because he committed the crimes with other active Broderick Boys gang members, he had

tattoos demonstrating an affiliation with the Broderick Boys, and he admitted to affiliating with the Norteño criminal street gang in a jail classification interview.

In Detective Boudinot's opinion, defendants were also active Broderick Boys gang members. As for Cadenaz, his cell phone contained videos taken several hours before and several hours after the robberies. In the videos taken before the robberies, Cadenaz is seen with brothers Alec[4] and Victor J. Alec wore his hair in a braided ponytail. Cadenaz is depicted in the videos recorded after the robberies wearing a red shirt and in the presence of N. L. and Victor. In the videos recorded after the robberies, all three men can be seen flashing handfuls of cash. In the videos, both before and after the robberies, the men exhibited gang signs representative of the Broderick Boys. Also on Cadenaz's phone was a video from September 21, depicting Alec displaying gang signs. Detective Boudinot testified he believed Alec to be a Broderick Boys "associate."

In March, Cadenaz was stopped with Alec and N. L. for driving a car with an expired registration. Upon a search of the car and the men in it, officers found bullets to a .38-caliber revolver in N. L.'s pocket, an imitation firearm in the center console, and a small amount of marijuana. Officers also found a loaded modified rifle in the trunk.

Officers found a rap video entitled "Active" posted online showing Cadenaz and known gang members. The video was filmed in West Sacramento and featured a sign that said Broderick, as well as lyrics celebrating the Broderick Boys criminal street gang.

Cadenaz's girlfriend knew Cadenaz to associate with Alec, Victor, N. L., and Hernandez. She had seen the five men exhibit gang signs and wear red. Cadenaz had in the past identified himself to his girlfriend as a Broderick Boy, but only because he had grown up in the neighborhood. Cadenaz never told his girlfriend he was involved in a gang. Alec and Victor also grew up in the Broderick neighborhood.

---

[4] Alec is the same Alec photographed with Hernandez driving through a red traffic light in Citrus Heights.

At trial, Cadenaz exhibited a "114th percent" tattoo on one hand, which he did not have before his arrest. To Detective Boudinot, this was significant because it referenced the number 14 and showed Cadenaz was continuing to participate in gang activity after his arrest.

As it pertained to Hernandez, he had multiple police contacts indicating gang affiliation. In June 2013, Hernandez was involved in a traffic stop with two other individuals. As a result of the traffic stop, all three individuals were validated by police officers as Norteño gang members. Hernandez's validation was based on his wearing of red shorts under his jeans and a red belt buckle with the letter N on it. He also had the word Turlock tattooed across his chest and four dots on his left hand. Further, Hernandez admitted to being a member of the Norteño gang.

In June 2014, the police contacted Hernandez while he and two validated Norteño gang members were riding public transit without the proper fare. Hernandez was wearing red items of clothing at the time.

Hernandez was also contacted by police in July 2014 after he was involved in a fight that included the presence of a knife. Three other people were contacted with Hernandez, two of whom were validated Norteño gang members, although not members of the Broderick Boys subset. One of the validated Norteño gang members and the other individual were Hernandez's brothers.

In April 2016, Hernandez was contacted by police in connection with a report of a large fight in downtown Sacramento. Hernandez was in the presence of a validated Norteño gang member, although that gang member did not belong to the Broderick Boys subset. Police encountered another individual in connection with the fight who was also a validated Norteño gang member. That individual possessed a knife. When officers asked Hernandez about his criminal history, he responded he had "done his dirt" in "the 209."

In addition to his police contacts, Hernandez had several tattoos indicative of gang membership. Across his chest is the word Turlock in bold lettering, on his right shoulder is

11

the letter N, and on his left shoulder is the letter X and the number 4. On Hernandez's right hand is a single dot, on his left hand are four dots, and behind his ear is a crown with his wife's name under it.

A search of Hernandez's phone revealed text messages referencing the 14 bonds, which is important in Norteño culture and constitutes the gang's governing rules. Hernandez also communicated with known Broderick Boys gang members via text message, including Cadenaz, and referred to them as "carnal," meaning brother, which is common among closely affiliated gang members.

Finally, as to Hernandez, Detective Boudinot found a rap video on the internet posted by an active Broderick Boys gang member paying respect to Hernandez and N. L. entitled "Free Ricky, Turlock, 209, Free Lil [N. L.]." Hernandez, however, was not present in the rap video.

In addition to defendants, Detective Boudinot believed N. L. and J. B. were active Broderick Boys gang members. J. B. was encountered on April 15, 2014, with three other people, one of whom was an active Broderick Boys gang member, while they were pointing a green laser into the sky at a California Highway Patrol aircraft. The next month, J. B. assaulted his sister's boyfriend by knocking the boyfriend's glasses off his face, kicking and punching him several times, and spitting on him twice. There were other people present and one of them recorded the assault. J. B. said Broderick to the camera during the assault.

During a search of a bag filled with J. B.'s clothing, officers found a belt buckle with the letter B on it, shoes with red soles, and a red canvas belt. J. B. had multiple photos on his social media profile of him flashing gang signs associated with the Norteño criminal street gang and the Broderick Boys subset, wearing gang clothing, and associating with other individuals flashing gang signs. The username associated with the picture included the term Broderick and the area code 916, which is the area code of the Broderick Boys' claimed territory.

As it related to N. L., he was arrested in January 2014 with two other juveniles for spraying graffiti depicting the number 14, the acronym BRK, dots representing the number 14, the term North Side, and the word Broderick. In August 2015, N. L. was arrested after demanding money from several people and a cashier at a convenience store while pointing a concealed water hose nozzle at them from under his shirt. N. L. wore a red shirt during those attempted robberies.

N. L. has four dots tattooed on one hand and one dot tattooed on the other. Multiple photographs of N. L. were discovered on his phone showing him possessing a handgun, exhibiting gang signs, showing off large amounts of cash, and wearing red. There was also a photo of N. L. holding a large bag of marijuana while wearing red and flashing gang signs. Following the crimes, N. L. was in several gang-related rap videos posted online, which contained documented Broderick Boys gang members.

As for the robberies themselves, Detective Boudinot believed they were committed for the benefit of a criminal street gang. To Detective Boudinot, the robberies appeared to be defendants and N. L. proving their worth to one another and earning respect and money to further the gang's enterprise. Detective Boudinot, however, did not know of any information demonstrating the money taken during the robberies went up the Broderick Boys chain of command. It was Detective Boudinot's understanding that the Broderick Boys gang was a loosely structured gang and each member decided on his own the day-to-day criminal activities to engage in without coordinating with the larger gang structure.

Detective Boudinot also thought it significant the group used guns during the commission of the robberies. The fact that defendants did not flash gang signs or wear obvious gang-related clothing during the robberies did not change Detective Boudinot's opinion about defendants' intent to benefit the gang. To Detective Boudinot, the group relied on their shared gang connection when committing the crimes and concealing their criminal activity. That bond was made evident by defendants' association with gang

13

members around the time of the crime, possession of gang clothing, and reliance on the gang principle of loyalty during the police interviews.

## III

### *Verdicts And Sentencing*

The jury found defendants engaged in a conspiracy and committed a variety of offenses against different victims related to the robberies recounted above, including second degree robbery, attempted second degree robbery, and assault with a firearm. The jury further found defendants guilty of possession of marijuana for sale and two gun-related offenses pertaining to the guns seized upon defendants' arrests. The jury found Hernandez guilty of an additional gun-related offense based on his exhibition of a firearm at a West Sacramento convenience store before the robbery spree began. As to each of these offenses, except for the possession of marijuana for sale offense, the jury found true attached gang enhancements. As to the second degree robberies and attempted robberies, the jury also found true various gun enhancements. In Cadenaz's case, the jury found true both personal use of a firearm enhancements and the gang-related gun enhancements; while in Hernandez's case, the jury found true only gang-related gun enhancements. Defendants were each found guilty of multiple participation offenses, and, for one of those offenses, the jury found true an attached personal use of a firearm enhancement for each defendant.

The trial court sentenced Hernandez to a term of 45 years 8 months in prison and Cadenaz to 56 years 4 months in prison. It further imposed various fines and fees.[5]

Defendants appeal.

---

[5] Because we must remand defendants' case for retrial on the participation offenses and gang-related enhancement, we need not go into the particulars of the sentences or the imposed fines and fees.

DISCUSSION

I

*Assembly Bill No. 333 Requires Defendants Be Retried*

*On Only The Participation Offenses And Gang-Related Enhancements*

Defendants contend the changes enacted by Assembly Bill No. 333 require all of the convictions and enhancements to be reversed. We agree with defendants that the participation offenses and the gang-related enhancements must be vacated but disagree as to the other convictions and enhancements.

A

*Applicable Law*

Penal Code[6] section 186.22, subdivision (b)(1), provides for enhanced punishment when the defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." The section also provides for a substantive participation offense when the defendant "actively participates in a criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in felonious criminal conduct by members of that gang . . . ." (§ 186.22, subd. (a).)

Assembly Bill No. 333 amended section 186.22 in several fundamental ways. As relevant here, Assembly Bill No. 333 "redefines 'pattern of criminal gang activity' to require that the last of the predicate offenses 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed,' and that the predicate offenses 'were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational.' " (*People v. Lopez* (2021) 73

---

[6] Further undesignated section references are to the Penal Code.

15

Cal.App.5th 327, 345.)  In addition, the currently charged offense cannot be used as a predicate offense under the amendments made by Assembly Bill No. 333.  (*Lopez*, at p. 345)

Subdivision (g) of section 186.22 now defines the term "to benefit, promote, further, or assist" a criminal street gang to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational," which may include "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  Previously, proof of a *reputational* benefit to the gang would have sufficed. (See *People v. Ramirez* (2016) 244 Cal.App.4th 800, 819.)

Assembly Bill No. 333 also added section 1109, which allows for a defendant charged with a gang enhancement under section 186.22, subdivision (b) or (d) to request the enhancement be tried in a separate phase of the trial.  (§ 1109, subd. (a).)  If a defendant is charged with a participation offense (§ 186.22, subd. (a)), then the charge "shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.  This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."  (§ 1109, subd. (b).)

B

*Defendants Must Be Retried On The*

*Participation Offenses And Gang-Related Enhancements*

Defendants contend the changes enacted by Assembly Bill No. 333 apply retroactively to them.  The People agree in part.  The People concede the amendments having to do with the elements of the participation offenses and gang-related enhancements apply retroactively, but argue the addition of section 1109, which allows for a bifurcated trial on gang-related enhancements and participation offenses is not retroactive.  We agree Assembly Bill No. 333's amendments to section 186.22 are retroactive and, that as a result of the retroactive application of the amendments, defendants must be retried on the participation offenses and gang-related enhancements.  As it pertains to Assembly Bill No.

16

333's enactment of section 1109, we need not decide whether this provision is retroactive because, even if we assume it is, defendants cannot show the failure to hold a bifurcated proceeding contributed to the jury's guilty verdicts for the participation offenses or its true findings on the gang-related enhancements.

In *In re Estrada* (1965) 63 Cal.2d 740, 744-746, our Supreme Court held that, absent evidence to the contrary, the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply retroactively to all whose judgments are not yet final on the amendments' operative date. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307-308; *People v. Brown* (2012) 54 Cal.4th 314, 323.) This principle also applies when an enhancement has been amended to redefine the conduct subject to the enhancement in a defendant's favor. (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 68, 70-71.)

Recently, the Second Appellate District, Division Eight, in *Lopez*, applying *In re Estrada*, held the amendments made by Assembly Bill No. 333 to section 186.22 are retroactive to nonfinal judgments. (*People v. Lopez*, *supra*, 73 Cal.App.4th at pp. 343-344.) *Lopez* reasoned Assembly Bill No. 333 increased the "threshold for conviction of the section 186.22 offense and the imposition of the enhancement." (*Lopez*, at p. 344.) Accordingly, the *Lopez* court concluded " '[A] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to pending case[s].' " (*Ibid.*, quoting *People v Figueroa*, *supra*, 20 Cal.App.4th at p. 68.) Several recent appellate decisions have applied this reasoning and have also concluded the amendments to section 186.22 are retroactive. (See e.g., *People v. Perez* (2022) 78 Cal.App.5th 192, 206-207; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1126-1128; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 291; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478; *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087; *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032 & fn. 9; *People v. Sek* (2022) 74 Cal.App.5th 657, 666-667.)

We agree with the parties and conclude Assembly Bill No. 333's amendments to section 186.22 apply retroactively to defendants.

As a result, defendants are entitled to a retrial on the participation offenses and gang-related enhancements unless the People can show beyond a reasonable doubt the jury would have found them guilty under the amended version of section 186.22. (See *People v. Sek*, *supra*, 74 Cal.App.5th at p. 668.) The People concede, and we agree, the record does not demonstrate beyond a reasonable doubt that the jury would have found defendants guilty of the gang-related offenses and enhancements. Indeed, none of the predicate offenses identified by Detective Boudinot were ever shown to have been committed for the benefit of a criminal street gang as that phrase is now defined, and some of the offenses no longer qualify as predicate offenses under amended section 186.22.

Further, Detective Boudinot based his opinion that defendants' charged crimes were committed for the benefit of the Broderick Boys gang on the benefit to the reputation of the gang members committing the crimes. Otherwise, Detective Boudinot testified the Broderick Boys gang was a loosely organized gang and he had no knowledge that any money produced from illegal activities went to the larger criminal gang network. Under the amendments to section 186.22, the prosecution must prove the benefit the gang derives from the charged offenses is "more than reputational." (§ 186.22, subd. (g).) Given Detective Boudinot's focus on the reputational benefit the crimes had on defendants within the gang, in addition to the failings of the predicate offenses under the new law, defendants' participation offenses and gang-related enhancements, including the gang-related gun enhancement under section 12022.53, subdivision (e), must be reversed.

As it pertains to Assembly Bill No. 333's addition of section 1109, the Courts of Appeal are split on whether the provision applies retroactively. Several courts have concluded section 1109 applies retroactively given the legislative history demonstrating the intended effect of a bifurcated trial was to lessen the prejudice gang allegations carry. (See e.g., *People v. Burgos* (2022) 77 Cal.App.5th 550, 564-568; *People v. Ramos*, *supra*, 77

18

Cal.App.5th at pp. 1125-1131.) But others have concluded section 1109 operates only prospectively given the procedural posture of the provision. (See e.g., *People v. Perez*, *supra*, 78 Cal.App.5th at pp. 192, 207; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65.) Here, it is unnecessary to decide whether section 1109 applies retroactively or only prospectively. Even if the statute applies retroactively, neither defendant was prejudiced by the failure to bifurcate the trial on the participation offenses and gang-related enhancements.

Relying on dicta in *People v. Burgos*, *supra*, 77 Cal.App.5th 550 at page 568 (review granted July 13, 2022, S274743), defendants argue the failure to bifurcate gang-related charges and enhancements in accordance with section 1109 constitutes structural error requiring reversal of the remaining convictions and attached enhancements. We find that analysis unpersuasive. (See *People v. Montano* (2022) 80 Cal.App.5th 82, 108; *People v. Ramos*, *supra*, 77 Cal.App.5th at pp. 1131-1133 [concluding § 1109 error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836].) First, "[t]here is a strong presumption that any error falls within the trial error category," i.e., is not structural and thus "subject to harmless error analysis." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.) Second, the right to bifurcation under section 1109 is purely statutory. (Cf. *People v. Hinton* (2006) 37 Cal.4th 839, 873-874 [describing right to a separate proceeding under § 190.1 as "merely statutory, not constitutional"].) " 'Typically, a defendant who has established error under state law must demonstrate there is a reasonable probability that in the absence of the error he or she [or they] would have obtained a more favorable result.' " (*Anzalone*, at p. 553; accord, *People v. Epps* (2001) 25 Cal.4th 19, 29 [where the error "is purely one of state law, the *Watson* harmless error test applies"].)

Defendants alternatively claim the alleged error violated their constitutional due process rights. We also disagree with this contention, but conclude the alleged error is harmless under the standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].

Starting with Hernandez's conviction for exhibition of a firearm, surveillance cameras recorded Hernandez inside a convenience store and a witness identified Hernandez

at trial as the person he saw in the convenience store who later pulled up his shirt to flash the handle of a gun tucked in his waistband. Based on the eyewitness identification in addition to the surveillance footage, we are convinced beyond a reasonable doubt the gang evidence did not contribute to the guilty verdict rendered on the exhibition offense.

As it pertains to defendants' convictions for possessing guns in a car, defendants were arrested while in the presence of those loaded and concealed guns. Similarly, defendants were arrested with a large amount of marijuana in a polka dot bag owned by Cadenaz with a digital scale in the vicinity. Cadenaz admitted to owning the polka dot bag in his police interview. Further, Hernandez's cell phone revealed multiple text messages pertaining to the sale of marijuana. Thus, as to the gun and marijuana offenses, we are convinced beyond a reasonable doubt the gang evidence did not contribute to defendants' convictions for these offenses.

Finally, as to the conspiracy and the robbery-related offenses, defendants were recorded on surveillance cameras either committing the robberies or entering/leaving the places that were robbed. While the videos were grainy, shoes similar to the black shoes with white soles one of the suspects wore on the surveillance footage were found in Hernandez's possession and a shoe print taken from one of the convenience stores possibly matched that shoe. The suspect with the black shoes with white soles on the surveillance footage also wore a ponytail hairstyle similar to Hernandez's ponytail hairstyle. Items stolen from the convenience stores were found in the gold sedan owned by Hernandez's wife and used by Hernandez. Items stolen from the convenience store were also found in the truck defendants were arrested in, as well as near the blue sedan owned by Cadenaz's girlfriend, which Cadenaz borrowed at the time the crimes were committed. Gloves matching the gloves worn by the robbery suspects were found in the car owned by Hernandez's wife, and clothes matching those worn by the suspects were found at Hernandez's home.

20

Cadenaz was pictured around the time of the robberies wearing bright green gloves and holding a black semiautomatic handgun. A suspect recorded on the surveillance footage also wore bright green gloves and possessed a black semiautomatic handgun. Further, defendants attempted to conceal evidence used during the crime by covering both the gold sedan and blue sedan with car covers. Given this strong evidence distinct from the evidence related to defendants' gang involvement, we are convinced beyond a reasonable doubt the gang evidence did not contribute to the jury's determination that defendants committed the robbery-related offenses. Accordingly, reversal of defendants' convictions and enhancements not pertaining to the gang affiliation is unwarranted.

For these same reasons, we find unpersuasive defendants' claim the prejudicial spillover doctrine adopted by the Third Circuit Court of Appeals, if applied here, results in reversal of defendants' convictions and enhancements unrelated to their gang involvement. (See *U.S. v. Wright* (3d Cir. 2012) 665 F.3d 560, 575 [utilizing a four-factored test to determine whether evidence pertaining to insufficiently proven charges influenced the findings on the remaining charges].) As demonstrated, the evidence of defendants' involvement in the nongang related offenses and enhancements was overwhelming and distinct from the participation offenses and gang-related enhancements. Defendants' defense was that they were not the ones depicted in the surveillance footage and it could have been men also affiliated with the Broderick Boys gang. Thus, the jury did not believe defendants were the men depicted in the surveillance footage, as opposed to the other men, simply because of their gang involvement. Finally, the trial court frequently instructed the jury that the gang evidence offered by the prosecution was to be considered only in connection with the participation offenses and gang-related allegations and not when considering whether defendants were guilty of the substantive charges and enhancements. We presume the jury followed these instructions. (*People v. Fuiava* (2012) 53 Cal.4th 622,

21

669.) Taken together, defendants' due process rights were not infringed upon by the gang evidence admitted at trial.[7]

II

*Hernandez Cannot Be Retried For The Participation Offense That Relies On His Exhibition Of A Firearm Conviction; Defendants Can Otherwise Be Retried On All Participation Offenses And Gang-Related Enhancements*

Defendants contend insufficient evidence was presented under the former version of section 186.22 (Stats. 2017, ch. 561, § 179) to prove the Broderick Boys was a criminal street gang, as required for both the participation offense and gang enhancement, or that they had the specific intent to benefit a criminal street gang, as required for the gang enhancement. As a result, defendants argue, they cannot be retried on the participation offenses and the gang-related enhancements. The People concede insufficient evidence supports Hernandez's gang participation conviction predicated on his misdemeanor exhibition of a firearm conviction, but otherwise argue sufficient evidence was presented such that defendants can be retried for all other participation offenses and gang-related enhancements. We agree with the People.

---

**7** We do not need to address Hernandez's challenges to the trial court's admission of the rap video referring to him or of Detective Boudinot's testimony to facts outside his personal knowledge, e.g., facts contained in jail classification records and gang questionnaires, because Hernandez's participation offenses and gang-related enhancements must be retried. We have already determined the gang evidence did not contribute to defendants' convictions on the substantive offenses and gun enhancements not related to their gang involvement, and thus any error in admitting the rap video or Detective Boudinot's improper testimony was necessarily harmless as to the jury's findings on those convictions and enhancements as well. Hernandez is free to argue for exclusion on remand when the trial court addresses evidentiary arguments anew and considers any intervening authority, including *People v. Valencia* (2021) 11 Cal.5th 818, in rendering its decisions.

22

A

*Sufficiency Of The Evidence*

"In reviewing a sufficiency of the evidence claim, our role is limited. We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt." (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11.) "We draw all reasonable inferences in favor of the judgment." (*Ibid*.) "Matters of credibility of witnesses and the weight of the evidence are ' " 'the exclusive province' " ' of the trier of fact." (*Ibid*.)

For purposes of assessing the sufficiency of the evidence, we consider all the evidence presented at trial, including any evidence that should have been excluded. (*People v. Story* (2009) 45 Cal.4th 1282, 1296 ["when reviewing the sufficiency of the evidence for purposes of deciding whether retrial is permissible, the reviewing court must consider *all* of the evidence presented at trial, including evidence that should not have been admitted"].)

B

*Evidence Demonstrated The Broderick Boys Is A Criminal Street Gang*

A "criminal street gang," as formerly defined for both the participation offense and gang-related enhancements, was "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e) [of former section 186.22], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Former § 186.22, subd. (f).)

Thus, the prosecutor was required to prove three essential elements: "(1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members

23

either separately or as a group 'have engaged in a pattern of criminal gang activity.' " (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222.) The criminal acts enumerated by the statute included murder, robbery, burglary, weapons possession, assault with a deadly weapon, and other felonies. (Former § 186.22, subd. (e).)

Defendants contend the prosecutor failed to make an adequate showing on the second element.[8] Under former section 186.22, "[t]he phrase 'primary activities,' as used in the gang statute, implie[d] that the commission of one or more of the statutorily enumerated crimes [wa]s one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 323; see *People v. Duran* (2002) 97 Cal.App.4th 1448, 1464.) "Proof that a gang's members consistently and repeatedly have committed criminal activity listed in [former] section 186.22, subdivision (e) is sufficient to establish the gang's primary activities. On the other hand, proof of only the occasional commission of crimes by the gang's members [wa]s insufficient." (*Duran*, at pp. 1464-1465; see *Sengpadychith*, at pp. 323-324.) Past offenses, as well as the circumstances of the charged crime, were used to prove the group's primary activities. (*Sengpadychith*, at p. 323; *Duran*, at p. 1465.)

It was settled that expert testimony could establish the primary activities element. (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324; *People v. Vy*, *supra*, 122 Cal.App.4th at p. 1226; *People v. Duran*, *supra*, 97 Cal.App.4th, at p. 1465.) "The testimony of a gang

---

[8] The heading of one of Hernandez's arguments purports to contend the prosecutor failed to make an adequate showing as to the Broderick Boys' pattern of criminal activity. Hernandez, however, relies on *People v. Sengpadychith* (2001) 26 Cal.4th 316, for his argument, which pertains to the primary activities element of section 186.22, subdivision (e) and not the pattern element. (*Sengpadychith*, at p. 324.) Hernandez does not analyze the pattern element using the correct standard of examining the sufficiency of the predicate offenses offered by the prosecution. (Former § 186.22, subd. (e).) We repeatedly have held that the failure to provide legal authorities to support arguments forfeits contentions of error. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408; *Akins v. State of California* (1998) 61 Cal.App.4th 1, 50.)

expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, [were] sufficient to prove a gang's primary activities." (*Duran*, at p. 1465; *Sengpadychith*, at p. 324.)

Our Supreme Court observed in *Sengpadychith*, for example, that the expert testimony in *People v. Gardeley* (1996) 14 Cal.4th 605, was sufficient: "There, a police gang expert testified [the defendant's gang] was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. [Citation.] The gang expert based his opinion on conversations he had with [the defendant] and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies." (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324; see also *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330 [gang expert's specific testimony that gang's primary activities included robbery, assault, theft and vandalism was sufficient to prove primary activities element in light of expert's training and experience]; *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107, 112 [expert's testimony that gang's activities ranged from vandalism and battery, carjackings, weapons offenses, robberies, and murder, was sufficient]; *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207 [primary activities element proved by expert's testimony that gang "engaged in several of the crimes listed in section 186.22 as a primary activity," where he had personally investigated cases involving those offenses, talked to gang members about gang's activities, and testified about two predicate offenses].)

Conversely, in *Alexander L.* (2007) 149 Cal.App.4th 605, the defendant allegedly committed vandalism based on his "tagging" activities. When asked about the gang's primary activities, the expert testified, " 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti,

narcotic violations.' " (*Id*. at p. 611.) The expert, however, "did not directly testify that criminal activities constituted [the gang's] primary activities." (*Id*. at pp. 611-612.) No further questions were asked about the primary activities, and no specifics were elicited as to the circumstances of the crimes or how the expert obtained the information. Further, the basis for the expert's knowledge of the gang's primary activities was never elicited. (*Id*. at p. 612.)

Defendant's case is more like *Gardeley*. Detective Boudinot testified he had been a member of the West Sacramento Police Department for nine years and served on the gang task force for three years. He based his knowledge on his formal education in criminal justice, his additional law enforcement training in gang investigations, and numerous conversations with other gang experts in Yolo County. He further had hundreds of conversations with gang members and community members regarding local gangs over the course of his entire career with the West Sacramento Police Department. Specific to this case, Detective Boudinot reviewed a variety of court documents, social media platforms, pictures, and field identification cards associated with the people who had been convicted of the predicate offenses.

To that end, Detective Boudinot testified the primary crimes committed by the Broderick Boys were assaults with a deadly weapon, narcotics sales, vehicle thefts, robberies, shootings at inhabited dwellings, intimidating witnesses, and burglaries. He then pointed to the certified records of five Broderick Boys gang members, all of whom pled to a gang enhancement or participation offense when admitting to their substantive offenses. The substantive offenses these Broderick Boys gang members admitted to included attempted murder, assault, intimidating a witness, theft of a vehicle, three convictions of carrying a concealed weapon, and two convictions of possession of marijuana for sale.

Further, defendants were alleged to have committed multiple robberies and assaults, and to have used stolen firearms during the commission of those crimes. The evidence also demonstrated Hernandez's past criminal activity involved assaults with other known gang

members and the use of deadly weapons. The evidence further demonstrated an assault committed by J. B. during which J. B. yelled out the term "Broderick" in the presence of other people. And finally, other known Broderick Boys gang members, including N. L., made rap videos promoting the gang's criminal activities, including narcotics sales, gun possession, assaults, and robberies. Many of the crimes articulated by Detective Boudinot from his experience, as well as those revealed in certified records, the circumstances of the current offenses, and other evidence admitted at trial involve offenses listed in former section 186.22. (Former § 186.22, subd. (e).)

Defendants point to the fact that Detective Boudinot did not specifically testify the primary activity of the Broderick Boys gang was criminal activity, arguing that he merely testified to the crimes he knew some Broderick Boys gang members had committed, without demonstrating criminal activity was the gang's primary business operation. Not so. Detective Boudinot testified that "putting in work" for the Broderick Boys meant to commit crimes for the Broderick Boys and that the gang sustained itself financially through the selling of narcotics and committing robberies. Detective Boudinot further testified the Broderick Boys gang sustained itself as a dominant presence in the community through its reputation and violent crimes, including those outlined by Detective Boudinot. A reasonable inference from this testimony is that Detective Boudinot believed the primary activity of the Broderick Boys gang was criminal activity.

Relying on *People v. Perez* (2004) 118 Cal.App.4th 151, defendants further contend the evidence was insufficient to establish the Broderick Boys' primary activity was criminal activities given Detective Boudinot's testimony regarding the certified records of conviction for five gang members. To defendants, this seems like a low number of convictions given the number of members Detective Boudinot testified belonged to the gang.

In *Perez*, a member of a gang was prosecuted for the attempted murder of an Asian youth. (*People v. Perez*, *supra*, 118 Cal.App.4th at pp. 153-154.) In total, the prosecution presented evidence that six years earlier gang members had been involved in the attempted

27

murder of a youth and that a few weeks prior to the charged offense, after a fellow member of the gang was murdered by members of an Asian gang, three Asian men were shot one night and a fourth was shot a subsequent night. (*Id.* at pp. 156-157.)

In finding the evidence insufficient to show the primary activities of the gang in question were the commission of the enumerated offenses in former section 186.22, subdivision (e), the *Perez* court noted that no expert testimony was presented on the issue. It then stated, "[e]ven if we assume that the [gang in question] was responsible for the shootings of Asians on February 16 and 18, as well as the shooting of [the victim in the case before the court], such evidence of the retaliatory shootings of a few individuals over a period of less than a week, together with a beating six years earlier, was insufficient to establish that 'the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.' " (*People v. Perez*, *supra*, 118 Cal.App.4th at p. 160.)

As an initial matter, we observe there is no requirement the prosecution prove a gang's primary activities through the certified records of conviction alone. Indeed, the prosecution here relied on more than the certified records of conviction to demonstrate the Broderick Boys' primary activities, contrary to defendants' analysis. The prosecution relied on Detective Boudinot's personal knowledge gained by working as a gang officer in West Sacramento for three years, social media profiles, videos, as well as the circumstances of the current crimes, including the past conduct of defendants' and their known associates. Taken together, the prosecution presented much more evidence than the prosecution in *Perez*, such that sufficient evidence supports the jury's finding the Broderick Boys consistently and repeatedly committed criminal activities listed in former section 186.22, subdivision (e) as required by *Sengpadychith*.

28

## C

### *Evidence Demonstrated Defendants Specifically*
### *Intended To Benefit The Broderick Boys Gang*

Former section 186.22, subdivision (b) enhanced punishment when the defendant was convicted of an enumerated felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (Former § 186.22, subd. (b)(1).) This provision did not "depend on membership in a gang at all. Rather, it applie[d] when a defendant ha[d] personally committed a gang-related felony with the specific intent to aid members of that gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 67-68.) "A gang expert's testimony alone is insufficient to find an offense gang related. [Citation.] '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.' " (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657; accord, *Albillar*, at p. 63.)

Further, general testimony regarding gang culture fails to draw "any distinction between crimes in general and crimes carried out with the specific intent to promote, further, or assist gang activity." (*In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1364.) "[S]uch general opinion testimony as to intent" serves to expand "the gang enhancement statute to cover virtually any crime committed by someone while in the company of gang affiliates, no matter how minor the crime, and no matter how tenuous its connection with gang members or core gang activities." (*Ibid.*, italics omitted.) If such general opinion testimony were allowed, section 186.22, subdivision (b)(1), would be impermissibly converted into a general intent crime. (*In re Daniel C.*, at p. 1364.)

Defendants argue the evidence was insufficient because, while the prosecution argued defendants committed the crimes to enhance their reputation within the gang, Detective Boudinot's testimony did not support this contention and instead pointed merely

29

to the fact defendants were gang members to demonstrate their commission of the alleged crimes was gang related. Not so. As described, Detective Boudinot testified that "putting in work" for the Broderick Boys meant to commit crimes with fellow gang members. The purpose of this conduct was to show other gang members a willingness to put oneself at risk for the gang and keep the confidences of the gang. To that end, "putting in work," i.e., committing crimes, was also a way to become a member of the Broderick Boys gang. Committing crimes for the gang not only led to an increased reputation for the gang, but also for the individual members within the gang.

What led Detective Boudinot to believe this was the case for defendants and N. L. during the commission of the charged crimes was that the group was obviously working together in a coordinated effort and relied on their bond as gang members. Contrary to defendants' assertions, this opinion was supported by the evidence presented at trial. In pictures taken of Cadenaz before and after the robberies, he was with Broderick Boys affiliates flashing gang signs. In some of those photos he was holding a gun similar to the gun used in the robberies. In a picture discovered on Cadenaz's cell phone, taken after the robbery, a friend known to flash Broderick Boys gang signs was holding a large amount of cash. A reasonable inference drawn from these photos is that Cadenaz shared with Broderick Boys affiliates the fact he committed robberies, and thus bolstered his reputation with those affiliates.

Similarly, when defendants were arrested, they relied upon gang themes of loyalty when speaking to the police. Hernandez called Cadenaz, N. L., and J. B. his loved ones, a term which Detective Boudinot testified was common among gang members. The group also talked about the importance of not talking to the police and expressed concern other members of the group would "snitch" or talk to police. Finally, after his arrest, Hernandez and N. L. were praised by a Broderick Boys gang member in an online rap video, demonstrating their criminal acts had the intended effect of bolstering their reputation within the Broderick Boys gang.

30

At bottom, Detective Boudinot testified the crimes were gang related because of the resulting benefit to the individual reputations of the gang members who committed the crimes. The fact Cadenaz had pictures on his phone boasting of his criminal activities with Broderick Boys affiliates and Hernandez was later praised by a Broderick Boys gang member in a gang-related rap video supplies evidence corroborating Detective Boudinot's testimony defendants' reputations were enhanced within the gang by the criminal activities. Accordingly, sufficient evidence supports the jury's findings defendants intended to benefit the Broderick Boys gang during the commission of the charged crimes.

D

*Evidence Did Not Demonstrate Hernandez Participated*

*In A Criminal Street Gang When Exhibiting A Firearm*

Under the former gang statute, "liability [for the participation offense was] limited 'to those who promote, further, or assist a *specific felony* committed by gang members and who know of the gang's pattern of criminal gang activity.' [Citation.] In other words, the provision 'requir[ed] the promotion or furtherance of *specific conduct* of gang members and not inchoate future conduct.' " (*People v. Valenzuela* (2019) 7 Cal.5th 415, 422.) "Following the Supreme Court's decision in [*People v. Rodriguez* (2012) 55 Cal.4th 1125], a conviction for gang participation under section 186.22[, subdivision ](a) require[d] the prosecution to prove the alleged gang member engaged in felonious conduct with another member of his or her gang." (*People v. Strike* (2020) 45 Cal.App.5th 143, 149-150.)

In Hernandez's case, the prosecution alleged in the participation offense charged in count 3 that Hernandez participated in a criminal street gang at the time he exhibited and shot a gun on October 18, before the commission of the robberies. The jury found Hernandez had exhibited a firearm, a misdemeanor, in relation to that incident and acquitted him of shooting from a vehicle, a felony. As a result, the prosecution failed to prove felonious conduct in relation to the participation offense charged in count 3. Accordingly, insufficient evidence supports that conviction, and it must be reversed.

31

III

*The Trial Court Did Not Abuse Its Discretion By*

*Admitting Victim Impact Evidence And, To The Extent It Erred*

*By Admitting Lay Opinions Of Police Officers, The Error Was Harmless*

We review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90.)

A

*Victim Impact Evidence*

Defendants contend the trial court erred by permitting some of the victims of defendants' robbery-related offenses to testify about how the crimes affected them beyond the event itself. The People argue defendants' contentions as to some of the victims are forfeited for failing to object at trial. The People further argue defendants' due process claim is forfeited because, to the extent they objected to the admission of this evidence, it was on Evidence Code section 352 grounds.

We disagree that defendants forfeited their claim. Defendants made numerous objections throughout trial to this type of evidence, and the trial court repeatedly overruled the objections. It is reasonable defendants believed further objections would be futile (see *People v. Powell* (2018) 6 Cal.5th 136, 171-172) and, in any event, defendants made clear the reasons for their objection to this type of evidence and the trial court made clear its position the objections were meritless, such that the claim has been preserved for our review (*People v. Abbott* (1956) 47 Cal.2d 362, 372-373). Further, because defendants' due process claim rests on the same grounds as their Evidence Code section 352 claim, we also consider this claim preserved. (*People v. Partida* (2005) 37 Cal.4th 428, 435.) On the merits, however, we conclude the trial court did not abuse its discretion by admitting evidence of the long-term effect defendants' crimes had on their victims.

### 1

### *Background*

After the prosecutor elicited testimony from defendants' victims pertaining to the events of the robberies, he asked several of them if they experienced any long-term effects associated with the robberies. A victim of the Denny's robbery testified that, for several months after the robbery, she had "issues" when going out of the house, especially to restaurants. Specifically, she always felt she needed to sit facing a door. Another victim of that robbery testified the robbery caused him to occasionally have nightmares and become more anxious. A third victim of the Denny's robbery testified he was afraid to go places where there were a lot of people around, especially at night. Finally, a Denny's employee testified he suffered no long-term effects from the robbery. A victim of the last convenience store robbery testified the robbery was a traumatic experience for him that has had long term effects. A different robbery victim testified that, since the robbery, he often gets scared.

### 2

### *There Was No Error*

Our Supreme Court has held a "defendant's claim that . . . testimony constituted impermissible guilt phase victim impact testimony is simply an objection that the testimony was irrelevant or more prejudicial than probative." (*People v. Banks* (2014) 59 Cal.4th 1113, 1165, abrogated on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; see *People v. Redd* (2010) 48 Cal.4th 691, 731, fn. 20 [no distinction between alleged error in admission of victim impact evidence and admission of any other irrelevant evidence].) Moreover, the California Supreme Court has expressly rejected an assertion that the admission of victim impact evidence during the guilt phase at trial, such as that admitted here, violates a defendant's constitutional rights. (*Redd*, at p. 732, fn. 21.) Thus, as an initial matter, we reject defendants' argument that admission of victim impact evidence during the guilt phase of trial violated the right to due process.

As to defendants' state law claim, relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see also *People v. Kraft* (2000) 23 Cal.4th 978, 1034.) The trial court may exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. (Evid. Code, § 352.) That the evidence is adverse to a defendant's case does not make it prejudicial within the meaning of Evidence Code section 352. (*People v. Salcido* (2008) 44 Cal.4th 93, 105.) The prejudice referred to in the statute is evidence which tends uniquely to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)

Here, the prosecutor asked some victims of defendants' robberies and attempted robberies how the crimes affected them after the incidents. The trial court found these questions relevant to the victims' credibility. Indeed, a completed robbery or attempted robbery requires a finding the defendant took (or attempted to take) property from another by force or fear. (§ 211.) The fact a victim experienced long-term adverse effects from an interaction such as this would tend to prove the victim was put in fear at the time of the incident in question.

The evidence was further not unduly prejudicial to defendants' case. Evidence of the fear the victims were placed in was already before the jury, making additional related evidence unlikely to bias a juror or evoke an emotional response. Also, the prosecutor asked minimal questions of each witness, taking up very little time and the subject was not the focus of their testimony. Accordingly, the trial court did not abuse its discretion by admitting evidence of the ongoing impact defendants' crimes had on their victims.

B

*Any Error In Admitting Police Identification And Opinion Evidence Was Harmless*

Defendants contend the trial court abused its discretion by permitting several detectives to testify about the identity of the men recorded on surveillance footage.

Hernandez raises a separate but related argument pertaining to detectives' testimony about his and J. B.'s conduct while in the parking lot before their arrests. To the extent the trial court erred by admitting identification and opinion evidence, the error was harmless.

1

*Background*

During motions in limine, defendants objected to the prosecution's plan to introduce the testimony of police officers to identify defendants in the surveillance footage. The court ruled the prosecutor would be permitted to ask the officers questions related to the identity of the subjects captured on the surveillance footage to the extent the testimony was "based on their personal review and perception . . . ."

Sacramento Police Detective Kelley Elliott testified about her investigation into the robberies that occurred in Sacramento. As part of her testimony, Detective Elliott said she reviewed photographs of evidence seized from the various searches conducted by West Sacramento police officers and surveillance footage of the last convenience store robbery. During her review of the photographs, she noticed the guns depicted in the photographs of items seized from defendants were similar to the guns depicted on the surveillance footage. This was also true as to the shoes depicted in photographs of seized items and the shoes depicted on the surveillance footage. On cross-examination by Cadenaz's counsel, Detective Elliot testified that, in her opinion, Cadenaz was the man wearing the green gloves and holding a black handgun in the surveillance video of the last robbery. She based this opinion on "the totality of the evidence located by [the] West Sacramento [Police Department] and what has been presented to me, when I look at things similar, such as a similar pair of gloves being located, my video surveillance, the shoes, in conjunction with the codefendants, what they were wearing, what was seized by them, as well as their shoes, the gel shoe lift impression and that conclusion that was made, it leaves me to believe that is Mr. Cadenaz in that video."

During Detective Boudinot's testimony, he reviewed surveillance footage of the robberies with the jury. During that line of testimony, the prosecutor asked Detective Boudinot whether he was able to identify the subjects in the surveillance footage, "based on [his] personal contact with any of the suspects involved in this case . . . , based on your personal conversations with them, based on your ability to observe in person their physical stature, based on your review of surveillance footage that you've watched in the entirety of this case that you were charged with investigating . . . ." Detective Boudinot answered in the affirmative.

He then identified Cadenaz based on his height and build, and Hernandez based on his ponytail and the shoes Detective Boudinot seized from him that matched the shoes worn by one of the suspects in the surveillance footage. In conjunction with these identifications, Detective Boudinot extensively testified about the items in the surveillance footage that appeared similar to items discovered during searches of defendants' property and in other surveillance footage.

Detective Boudinot also identified Hernandez's voice in one of the videos based on his interactions with Hernandez and testified to his belief that Hernandez was the subject in the video who was in the position to most likely utter the words "come on, come on." West Sacramento Police Detective Anthony Herrera also testified he recognized defendants in the surveillance footage depicting the robberies based on his review of the surveillance footage, personal interactions with them, and knowledge of their heights and builds.

Detective Herrera further testified about his observations of the surveillance footage depicting defendants with N. L. and J. B. in the apartment complex parking lot before their arrests. Detective Herrera identified defendants on the surveillance footage and testified that Hernandez's movements particular to his waistline led Detective Herrera to believe Hernandez was concealing a gun in the waistband of his pants. Detective Herrera explained he had previously attended a class called "Notice Armed Subjects" where he learned how to identify people concealing firearms. Specific to Hernandez, Detective Herrera explained

36

that Hernandez was touching his waistline "to make sure the gun is still there, the movement of the gun, make sure [it] didn't shift, it is called stat patting, and he definitely did that when he got out of the vehicle, when he walked around the front of the hood of the car, and now you can see the bulge in the shirt, and then you can still see kind of towards the right side of the front side." Later in the video, Detective Herrera again identified an instance of Hernandez "stat patting." Detective Herrera also pointed out Hernandez's movements while parking his car in the parking lot and getting out of the driver's seat that signaled to him Hernandez was concealing a gun in his pants. Indeed, Detective Herrera testified he could see a small portion of a silver gun at various points in the surveillance footage. Detective Boudinot also testified he believed Hernandez was concealing a weapon in his waistband but did not reveal his thought process in reaching that conclusion.[9]

During Detective Herrera's testimony, he also identified J. B. and described his movements as "checking the lights in the back of the car to make sure that they're working." The trial court allowed the testimony over a speculation objection because the jury was able to view the video and tell for itself whether Detective Herrera's impressions of J. B.'s conduct were accurate. Detective Herrera further testified that, based on his training and experience, he thought J. B.'s conduct was suspicious "in the realm of somebody who has committed a crime and doesn't want to get pulled over, but usually would check to make sure that the vehicle that they are driving in will not get pulled over [by] the cops for like a headlight being out or taillights or signal lights not working." The trial court allowed this testimony over a speculation objection, noting its admission was a close call.

Detective Boudinot testified he saw defendants, N. L., and J. B. conducting a brake check of the gray truck. In his opinion, "this [wa]s to avoid law enforcement detection." He later used this conduct to demonstrate how the group relied on their gang connection to conceal evidence. Specifically, "[y]ou have an individual working the brake pedal and an

---

**9**      Hernandez does not challenge Detective Boudinot's opinion on appeal.

individual on the outside checking the brake lights.  This is to ensure that they elude law enforcement detection."

## 2

### *Police Identification  Of Defendants*

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.  (Evid. Code, § 800.)  '[T]he identity of a person is a proper subject of nonexpert opinion . . . .'  (*People v. Perry* (1976) 60 Cal.App.3d 608, 612 . . . (*Perry*); accord, *People v. Mixon* [(1982)] 129 Cal.App.3d [118,] 127 (*Mixon*).)"  (*People v. Leon* (2015) 61 Cal.4th 569, 601.)

In *Leon*, a detective identified the defendant in surveillance  videos.  (*People v. Leon*, *supra*, 61 Cal.4th at p. 600.)  The detective was familiar  with the defendant based on the detective's postarrest  contacts with the defendant.  (*Id*. at pp. 600-601.)  That is, the detective was the one who arrested the defendant, saw him nearly 10 times thereafter, and spent about two hours with him.  (*Id*. at p. 600.)  Moreover, the jacket the defendant was wearing when he was arrested appeared to be the same jacket worn by the suspect in the surveillance  videos, and the car in the videos looked like the car the defendant was in when he was arrested.  (*Id*. at pp. 600-601.)  Our Supreme Court concluded this identification was properly admitted.  (*Id.* at p. 601.)

Our Supreme Court in *Leon* cited *Perry*, where a police officer reviewed video surveillance  of a robbery.  (*People v. Perry*, *supra*, 60 Cal.App.3d at p. 612.)  The officer was able to identify the defendant as one of the robbers based on the officer's "numerous" prior contacts with the defendant in the five years before the robbery and based on the defendant's "abnormal-appearing  eye."  (*Id*. at p. 610.)  Other people who did not witness the robbery but who knew the defendant (e.g., his apartment manager, the defendant's former employer,  and brother) also gave their opinions on whether the defendant was the person in the video surveillance,  reaching different conclusions.  (*Id*. at pp. 611-612.)  In upholding the identifications,  the court said the witnesses' opinions were sufficiently based

on personal knowledge, and that the degree of knowledge went to the weight rather than the admissibility of the opinions. (*Id*. at p. 613; accord, *People v. Mixon*, *supra*, 129 Cal.App.3d at pp. 131-132 [officer's identification of the defendant from surveillance photographs admissible because the officer was familiar with the defendant from prior contacts].)

Defendants do not challenge Detectives Herrera's or Boudinot's identifications based on their personal knowledge. Defendants challenge their identifications on the ground the identifications were not helpful to the jury's determination of guilt because defendants had not changed their appearances since the robberies, as was the case in *Leon*, *Perry*, and *Mixon*. Defendants misread these cases. In *Leon*, our Supreme Court concluded the detective's identification aided the jury because the defendant's appearance had changed; it did not hold that the only reason an officer's identification would aid the jury was if the defendant's appearance had changed. (*People v. Leon*, *supra*, 61 Cal.4th at p. 601.)

In that vein, defendants argue the detectives' identifications were not helpful because the subjects in the surveillance footage covered their faces, thus an identification based on facial features was impossible. But Detectives Herrera and Boudinot did not identify defendants based on facial features; instead they were identified based on their height, build, gait, voice, and clothing. This, in particular, was why Detectives Herrera's and Boudinot's identifications were helpful. (See *People v. Mixon*, *supra*, 129 Cal.App.3d at p. 125 [identification helpful because robbery suspect wore a ski cap pulled down to his earlobes, and the camera angle was such that his face was visible from the middle of the nose down].) Although jurors were able to observe defendants in the courtroom, defendants were sitting and the jurors might not have been able to study their movements, height, or build to the extent the detectives were able to before trial. For this same reason, we find unpersuasive defendants' argument the jury was in a similar position to Detectives Herrera and Boudinot to assess the identity of the men in the surveillance footage.

Moreover, no witnesses from the robberies were able to identify defendants as the robbers. Detectives Herrera's and Boudinot's testimony was helpful to the jury because they were able to highlight their " 'awareness of [certain] physical characteristics' " such as the clothing worn on the day of the burglary. (See *People v. Leon*, *supra*, 61 Cal.4th at p. 601.) Their identification also assisted the jury to the extent that the quality of the footage was unclear or grainy. (See *People v. Ingle* (1986) 178 Cal.App.3d 505, 513 [lay-opinion testimony is admissible to aid the trier of fact where a photo is "unclear," a defendant's appearance has changed, or where a photo is inconclusive as to identity].) In addition, "because the surveillance video was played for the jury, jurors could make up their own minds about whether the pe[ople] shown w[ere] defendant[s]." (*Leon*, at p. 601.)

Finally, defendants argue Detectives Herrera's and Boudinot's opinions that defendants were the people in the surveillance footage was tantamount to an opinion they committed the offense and, as such, were inadmissible as opinions on guilt. (See *People v. Torres* (1995) 33 Cal.App.4th 37, 47 [witness not permitted to express opinion on defendant's guilt or innocence].) There is a difference between giving an opinion on a person's guilt and giving evidence tending to show guilt. Defendants' argument fails to appreciate that difference by suggesting that any evidence linking a defendant to a crime is inadmissible because it supports guilt. That is not the law.

As it relates to Detective Elliott's identification of Cadenaz in the surveillance footage of one of the robberies, she based that identification on evidence collected by other officers and not her personal perceptions of Cadenaz. Admission of her identification was thus error.[10] The error, however, was harmless under any standard. Detectives Herrera and Boudinot also identified Cadenaz in that footage and pointed to several items of clothing worn by the person in the surveillance footage that were seen in photographs of Cadenaz

___

[10] We note this evidence was not elicited by the prosecution, but by Cadenaz's attorney on cross-examination. The People do not argue invited error or forfeiture.

and were recovered from cars or houses Cadenaz had access to around the time of the robberies. Given the multiple other identifications of Cadenaz in the videos and other evidence linking him to the robberies, it is not reasonable the jury relied on Detective Elliott's identification of Cadenaz when it found him guilty of the robberies.

3

### *Purported Meaning Of Hernandez's And J. B.'s Conduct*

Hernandez contends the trial court abused its discretion by admitting improper expert and/or lay opinion testimony when it permitted Detective Herrera to testify Hernandez had a gun in the waistband of his pants and when it permitted both Detectives Herrera and Boudinot to testify J. B.'s checking of the brake lights on the gray truck was done for the purpose of avoiding detection from police. The People argue Hernandez forfeited the issue because he never argued the detectives' testimony constituted improper expert and/or lay opinion at trial, instead he argued only that the testimony was speculative. We agree with the People, but also conclude any error was harmless.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (a); *People v. Bradley* (2012) 208 Cal.App.4th 64, 83 ["Appellants waived the claim of error . . . by failing to object on the ground [witness] testimony would constitute improper lay opinion."]; *People v. Stevens* (2015) 62 Cal.4th 325, 333 [the failure to object to admission of expert opinion testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted].) Having failed to object on the specific grounds raised on appeal, defendant cannot now claim error by the trial court.

41

In any event, any perceived error was harmless. It is not reasonably probable the jury would have returned a more favorable verdict as to Hernandez had Detective Herrera been precluded from testifying to his belief Hernandez was concealing a gun in the waistband of his pants in the parking lot prior to Hernandez's arrest. The jury was able to watch the surveillance footage of defendants in the parking lot prior to their arrests. While in the parking lot, defendants and N. L. moved various items from the gold sedan to the gray truck, including the nine-millimeter handgun used in the robberies, which was wrapped in a red rag. Many of the items used by defendants during the robberies or taken from victims during the robberies were found in the gold sedan, which Hernandez's wife owned, and Hernandez drove. A text message found on Hernandez's phone referenced his possession of the .38-caliber revolver around the time of the crimes. Further, upon Hernandez's arrest, the .38-caliber revolver was found in the gray truck in Hernandez's presence and Hernandez admitted to possessing a bullet from the .38-caliber revolver. Taking this evidence together, it is clear the jury would have found Hernandez was in possession of the revolver Detective Herrera believed him to be concealing around the time of the robberies even if Detective Herrera had never testified about his opinion.

Similarly, it is not reasonably probable the jury would have returned a more favorable verdict as to Hernandez had Detectives Boudinot and Herrera been precluded from testifying to their belief the group of men were attempting to avoid detection of law enforcement when they checked the brake lights on the gray truck. Before checking the brake lights, defendants and N. L. moved several items of incriminating evidence from the gold sedan to the gray truck, including packages of Swisher Sweets cigars and guns. They then covered the gold sedan with a car cover. These actions demonstrate defendants' intent to conceal evidence of their crime or otherwise avoid detection. Their additional act of checking brake lights on the gray truck added little to this determination.

42

*Any Error Pertaining To CALCRIM No. 417 Was Harmless Beyond A Reasonable Doubt*

Hernandez contends the trial court erred by instructing the jury with CALCRIM No. 417 because the instruction permitted the jury to find he was part of a conspiracy by relying on an attempted commission of a crime, which is not a valid theory of guilt. The People properly recognize this issue is not forfeited. "Because [defendants'] contention is that the instructions caused [them] to be convicted under an invalid legal theory, this contention need not be preserved by objection in order to be considered on appeal." (*People v. Powell* (2021) 63 Cal.App.5th 689, 710; see *People v. Valdez* (2012) 55 Cal.4th 82, 151.)

## A

### *Background*

The trial court instructed the jury pursuant to CALCRIM No. 417, pertaining to the liability of a coconspirator, in pertinent part: "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of [a] conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. . . . [¶] . . . [¶] To prove that defendant Ricky Hernandez is guilty of the crimes charged [in various counts], the People must prove[, among other elements,] that: [¶] 1. The defendant conspired to commit one of the following crimes: Robbery, *attempted robbery*, assault with a firearm and possession of marijuana for sale." (Italics added.)

## B

### *Any Error Was Harmless*

The People concede the trial court erred by instructing the jury with CALCRIM No. 417, in that it could find Hernandez guilty on a coconspirator theory of liability if it found he conspired to commit an attempted robbery. Indeed, as we have held, the crime of

43

conspiracy to commit an attempted specific-intent offense is a "conclusive legal falsehood," because "[n]o one can simultaneously intend to do and not do the same act . . . ." (*People v. Iniguez* (2002) 96 Cal.App.4th 75, 79.) In other words, "under a traditional conspiracy approach, one cannot conspire to try to commit a crime." (*People v. Johnson* (2013) 57 Cal.4th 250, 264.)

" 'Misdescription of an element of a charged offense is subject to harmless error analysis and does not require reversal if the misdescription was harmless beyond a reasonable doubt.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 69.) To conclude an instructional error harmless beyond a reasonable doubt, we must conclude the error " 'did not contribute to the verdict' " or that the error was " ' " unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." ' " (*Id.* at p. 70.)

Recently in *Powell*, we held that, because the error "was 'unimportant in relation to everything else the jury considered on the issue' of [defendant's] liability for second degree murder," it was harmless beyond a reasonable doubt under *Chapman*. (*People v. Powell* (2021) 63 Cal.App.5th 689, 718; *People v. Neal* (2003) 31 Cal.4th 63, 86.) "Of key importance to our determination that the instructional error . . . was harmless [was] the fact that the prosecutor did not rely on" the invalid theory, as "[c]ourts look to the prosecutor's argument as a relevant circumstance in determining whether instructional error is harmless." (*Powell*, at p. 715.) "Under the circumstances of th[e] case," we determined, "given that the jury was never steered in [an invalid] direction, it [was] clear" the instructional error was harmless. (*Id.* at p. 716; cf. *Boyde v. California* (1990) 494 U.S. 370, 380-381 [108 L.Ed.2d 316, 329] [because "[j]urors do not . . . pars[e] instructions for subtle shades of meaning in the same way that lawyers might," a "commonsense understanding of the instructions in the light of all that has taken place at the trial" is "likely to prevail over technical hairsplitting"].)

Here too, the trial court's instructional error (identifying attempted robbery as one object of the alleged conspiracy) was harmless beyond a reasonable doubt, because it was unimportant in relation to everything else the jury considered, given the evidence and closing argument. The prosecutor relied on the fact he believed defendants were involved in a conspiracy when presenting his case to the jury. His argument started out by imploring the jury to look at the circumstances of the "robberies" and how the method by which defendants arrived at the scenes of the robberies, executed their plan, and left the scenes looked orchestrated. When going through the facts of the crimes and alleged charges, the prosecutor did not refer to the events as attempted robberies but generally as robberies. The prosecutor further spoke of the conspiracy as a conspiracy to commit robbery and did not refer to other offenses defendants committed together during that discussion. Similarly, defendants' attorneys characterized the events generally as robberies, and referred to the conspiracy as a conspiracy to rob. As a result, the jury was never steered down a path of finding Hernandez culpable of conspiracy on an impermissible theory of liability.

Nor could the jury have been steered down the wrong path. The only thing that distinguished the robberies from the attempted robberies was that defendants were unable to take property from the victims they attempted to rob. In the end, the attempted robbery victims were in the presence of the robbery victims, making any finding defendants conspired to commit attempted robbery necessarily a finding they conspired to commit robbery. Thus, while the instruction permitted the jury to find Hernandez to be part of a conspiracy based on an attempted robbery, among other crimes, it is clear from the parties' closing arguments and the facts of the crimes that the jury was never steered toward that theory.

V

*There Was No Cumulative Error*

Hernandez contends cumulative error resulted from the combined effect of the individual errors alleged in his opening brief and adopted from Cadenaz's opening brief.

45

"Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have already concluded Hernandez's convictions for the participation offenses, with the exception of count 3, and his gang-related enhancements need to be retried, but that his guilt on the other offenses was not a product of the gang evidence admitted at trial. We, however, determined the trial court did err in giving the conspiracy instruction and assumed the trial court erred by permitting officers to testify to certain lay-opinion testimony. Considering the instructional and evidentiary errors in conjunction with the gang evidence, our conclusion remains unchanged that Hernandez received a fair trial on the substantive offenses and gun enhancements affirmed by this opinion.

VI

*The Trial Court May Address Defendants Alleged Sentencing Errors On Remand*

Defendants raise several claims of error occurring at sentencing. Cadenaz argues the trial court erred by imposing various fines and fees without first holding an ability-to-pay hearing and that recent amendments enacted by Senate Bill No. 567 (2021-2022 Reg. Sess.) retroactively apply to him. Hernandez argues the trial court imposed an unauthorized sentence on one of his attempted robbery convictions, erred by imposing various fines and fees without first holding an ability-to-pay hearing, and was unaware of its discretion to strike any or all of the firearm enhancements found true by the jury.

We need not address defendants' contentions because their case must be remanded for further proceedings after which the trial court will resentence them. (See *People v. Ramirez* (2019) 35 Cal.App.5th 55, 64 [when a case is remanded for resentencing, the trial court may consider the entire sentencing scheme and has jurisdiction to modify any aspect of a defendant's sentence].) At that time, defendants will be given the opportunity to raise any issues they believe relevant to their sentencing.

## DISPOSITION

Defendants' convictions for the participation offenses are reversed and the gang-related enhancements are vacated. The matter is remanded for retrial on those offenses and enhancements, except as to Hernandez's participation offense that was predicated on his exhibition of a firearm (count 3). Following retrial on the gang-related offenses and enhancements, the trial court shall resentence defendants under all newly-enacted provisions in effect at the time of their resentencing and address any sentencing contentions defendants raise at that time.

/s/_____
Robie, Acting P. J.

We concur:

/s/_____
Mauro, J.

/s/_____
Krause, J.

47